**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JEFFREY M. JASKOL AND STACEY J. JASKOL, Individually and On Behalf Of All Others Similarly Situated, | Case No. |
| Plaintiffs, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | **JURY TRIAL DEMANDED** |
| XYBERNAUT CORPORATION, EDWARD G. NEWMAN, STEVEN A. NEWMAN, THOMAS D. DAVIS, BRUCE C. HAYDEN, and GRANT THORNTON LLP, | |
| Defendants. | |

# PART 2 of 3

52.    On March 12, 2004, the Company filed its 2003 annual report on a Form

10-K with the SEC, reiterating the results it had announced in the March 9, 2004 press release.

53.    On May 4, 2004, Xybernaut issued a press release announcing its first

quarter 2004 results, reporting a 146% increase in total revenue from the same period in 2003.

In the release, the Company stated, in relevant part, as follows:

> FAIRFAX, Va.--(BUSINESS WIRE)--May 4, 2004--Xybernaut(R)
> Corporation (NASDAQ:XYBR) today announced that total revenue for
> the first quarter ended March 31, 2004 was $4.4 million, a 146% increase
> over the comparable 2003 period. Hardware revenue for the first quarter of
> 2004 totaled $2.9 million, increasing 256% from the first quarter of 2003.
>
> This represents the Company's second consecutive quarter of record
> revenue. Last quarter, the period ended December 31, 2003, the Company
> reported revenue of $3.7 million, a 43% increase in revenue over the
> fourth quarter of 2002.
>
> As of the end of the first quarter 2004, the Company had no long-term
> debt, cash of $12.5 million and record stockholders' equity of $18.3
> million.
>
> "We are pleased to announce back-to-back quarters with record revenue
> and strong year-to-year revenue growth," said Edward G. Newman,
> chairman and CEO of Xybernaut. "This strong momentum helps validate
> our belief that the more widespread adoption of wearable/mobile
> technologies is happening now. Our products and solutions are being
> deployed today and they are being deployed in record numbers. With low
> expenses and our losses decreasing, I continue to remain optimistic and
> positive about our prospects for the remainder of 2004 and thereafter,"
> continued Newman.

54.    On May 7, 2004, the Company filed its 2003 annual report with the SEC

on a Form 10-K, reiterating the results it had announced in the May 4, 2004 press release.

55.    On August 5, 2004, Xybernaut issued a press release announcing its

second quarter 2004 results, reporting a 21%, or $3.4 million, increase in total revenue from the

same period in 2003.  In the release, the Company stated, in relevant part, as follows:

> FAIRFAX, Va.--(BUSINESS WIRE)--Aug. 5, 2004--Xybernaut(R)
> Corporation (NASDAQ:XYBR) today announced results for its second
> quarter ended June 30, 2004. Total revenue for the second quarter of 2004
> was $3.4 million, a 21% increase from the comparable 2003 period. Total

revenue for the six months ended June 30, 2004 was $7.8 million, a 70% increase from the six months ended June 30, 2003. Beginning with the fourth quarter of 2003 and continuing through the second quarter of 2004, the Company has now reported its highest three quarterly revenues ever.

The Company also reported a strong balance sheet. As of June 30, 2004, the Company had no long-term debt, cash of $13.3 million and stockholders' equity of $16.5 million.

Defendant E. Newman touted the Company's results as follows:

"With revenues up 70%, the value of our intellectual property now being validated and having just come off the Company's strongest three quarters ever, I am confident that we are not only on the right track but also that our growth in many areas will now be sharply accelerating as we move forward," said Edward G. Newman, chairman and CEO of Xybernaut.

"Xybernaut solutions and technologies based on our intellectual property are now being deployed into a wide variety of major market sectors from homeland security applications used to examine moving cargo containers; to systems that can detect guns; to in-the-field monitoring solutions to combat West Nile virus; to information delivery systems used by Wall Street traders; to even a solution that will allow a disabled child to learn to communicate," Newman added.

56.     On August 6, 2004, the Company filed its second quarter 2004 report with the SEC on a Form 10-Q, reiterating the results it had announced in the August 5, 2004 press release.

57.     On November 9, 2004, the Company issued a press release announcing its third quarter 2004 results and reporting another increase in total revenue, as follows:

FAIRFAX, Va., Nov 9, 2004 (BUSINESS WIRE) -- Xybernaut(R) Corporation (NASDAQ:XYBR) today announced results for its third quarter ended September 30, 2004. Total revenue for the third quarter of 2004 was $3.2 million, a 20% increase from the comparable 2003 period. Total revenue for the nine months ended September 30, 2004 was $11.0 million, a 51% increase from the nine months ended September 30, 2003.

Other financial highlights for the three months ended September 30, 2004 include:

-- Licensing revenue from the non-exclusive grant of one of the

Company's "Dual-Use Flat Panel Display" patents;

21

-- Shipments of Atigo T systems to Tesco pursuant to the

Company's recently announced $9 million order; and

-- Beginning with the fourth quarter of 2003 and continuing through the third quarter of 2004, the Company has now reported its highest four quarterly revenues ever

Defendant E. Newman claimed that the Company was experiencing "top-line growth," stating, as follows:

"We are well on our way to our most successful year ever. In fact, our total nine-month revenues have already surpassed our previous 12-month high," stated Edward G. Newman, chairman and CEO of Xybernaut. "This top-line growth is the direct result of our continued and successful efforts to bring in new and larger customers while still maintaining our focus on existing partners. With our recently announced management team and enhanced corporate governance initiatives in place, I firmly believe that we are poised to continue to deliver positive results through the rest of 2004, 2005 and beyond."

58.    On the same day, November 9, 2004, the Company filed its third quarter 2004 report with the SEC on a Form 10-Q, reiterating the results announced in the press release issued on the same day.

59.    On December 16, 2004, the Company issued a press release about its annual shareholder meeting. In the release, defendant S. Newman stated that "2004 continues to be a banner year for the company as we anticipate continued success moving forward. Our efforts remain focused on enhancing both near and long-term shareholder value."

60.    The statements referenced above in ¶¶ 34-59 were materially false and misleading and known or recklessly disregarded as such by defendants because they failed to disclose the following facts, among others:

(a)    the Company's accounting and related disclosures in its financial statements during the Class Period were inadequate, improper, and inherently unreliable as evidenced by, among other things, the Company's auditor's public declaration that "it can no longer rely on management's representations";

22

(b)    defendant Edward G. Newman misappropriated Company funds for personal expenses;

(d)    the SEC had commenced an investigation of the Company relating to the sale of Xybernaut securities by a shareholder; and

(e)    the Company lacked adequate internal controls.

## THE TRUTH BEGINS TO EMERGE

61.    The truth began to emerge on February 17, 2005. On that day, after weeks of decline in the price of the Company's stock, Xybernaut issued a press release responding to shareholder inquiries, stating "that it knows of no business reason or financial condition that would explain the decline in its stock price."

62.    On March 14, 2005, Xybernaut issued a press release announcing that it had sought, and was granted, an extension to file its 2004 annual report with the SEC.  The Company stated that it intended to file its annual report by March 31, 2005.  In reaction to this news, the price of Xybernaut stock fell another $0.12 from its closing price of $0.72 on March 11, 2005, the previous trading day, to close at $0.60 on March 14, 2005.

63.    The statements referenced above in ¶¶ 61 and 62 were materially false and misleading and known or recklessly disregarded as such by defendants for the reasons set forth in ¶ 60.

64.    On March 31, 2005, after the market closed, defendants issued a press release revealing that they had discovered material weaknesses in Xybernaut's internal controls with respect to expense reimbursement, revenue recognition, and the monitoring of business risks.  Defendants stated that the Company had engaged independent legal counsel to conduct an internal investigation of these matters.  Moreover, defendants stated that as a result of the investigation, the Company could not predict when it would be able to file its 2004 annual report

23

with the SEC, and cautioned that the delayed filing would prevent the Company from registering additional shares of stock. In addition, the Defendants revealed for the first time that, on February 1, 2005, **nearly two months earlier**, it had received a subpoena from the SEC relating to the sale of securities by an unidentified shareholder. Xybernaut also announced that it had received notification from Nasdaq that the Company's stock, which had been trading below $1.00 per share, was subject to delisting. The Company stated, as follows:

> FAIRFAX, Va., Mar 31, 2005 (BUSINESS WIRE) -- Xybernaut Corporation (NASDAQ:XYBR) announced today that the filing of its Form 10-K and other related reports for the year ended December 31, 2004, anticipated to occur today, will be further delayed, pending completion of an internal investigation undertaken by its Audit Committee.
>
> On February 28th, the Audit Committee engaged independent counsel - Alston & Bird LLP - to assist it in conducting an internal investigation of, among other things, concerns brought to the Audit Committee's attention relating to the internal control environment of the Company, the propriety of certain expenditures and the documentation of certain expenses of the Chairman and CEO of the Company, the Company's transparency and public disclosure process, the accuracy of certain public disclosures, management's conduct in response to the investigation, and the propriety of certain major transactions. The Audit Committee's investigation is continuing, and the filing of the Company's 10-K will await the conclusions of that investigation. At this time, the Company is unable to predict when its 10-K will be filed.
>
> On February 1, 2005, the Company received a subpoena from the Northeast Regional Office of the Securities and Exchange Commission, seeking documents and other information relating to the sale of Company securities by any person identified as a selling shareholder in any Company registration statement or other public filing.
>
> As a result of the delayed filing of its Form 10-K, the Company will lose its status to file registration statements on form S-3, which has historically been utilized to expedite the registration of common stock issued in connection with the Company's financings. The loss of the right to use form S-3 could have a material impact on the ability of the Company to raise additional funds in the future, and therefore affect its ability to meet its obligations as they come due.
>
> Management is still in process of completing the Sarbanes-Oxley 404 internal control testing for the year ended December 31, 2004. However, certain material weaknesses currently have been identified related to the

control environment and control activities as it relates to the Company's policies and procedures in the expense reimbursement process, revenue recognition related to certain product sales, and monitoring of business risks. Management continues to evaluate the identified issues and is addressing remediation plans to be implemented.

Xybernaut also announced unaudited results for the year end December 31, 2004 in addition to 4th quarter results. Revenues for 2004 were approximately $13.9 million, with a net loss of approximately $19.7 million. Revenues for the 4th quarter were approximately $2.9 million, with a net loss of approximately $7.2 million. These unaudited results do not include possible further adjustments, including but not limited to, the matters discussed above.

On March 30, 2005 the Company received notice from the NASDAQ Stock Market that the bid price of the Company's common stock has closed below the minimum $1.00 per share requirement for the stock's continued listing under Marketplace Rule 4310(c)(4) (the "Rule). Therefore, the Company has until September 26, 2005 to become compliant. If, at any time before September 26, 2005, the bid price of the Company's common stock closes at $1.00 per share or more for a minimum of 10 consecutive business days, the Company will comply with NASDAQ's listing requirements. If not, NASDAQ will determine whether the Company meets NASDAQ SmallCap Market initial listing criteria as set forth in Marketplace Rule 4310(c), except for the bid requirement. If the Company meets the initial listing criteria, the Company will be granted an additional 180 day compliance period. If the Company is not eligible for an additional compliance period, the Company's securities will be delisted. At that time, the Company can appeal NASDAQ's determination to delist its securities to a Listing Qualifications Panel

In reaction to this news, the price of Xybernaut dropped another $0.18 per share from its closing price of $0.42 on March 31, 2005, to close at $0.24 on April 1, 2005

       65.    On April 8, 2005, Xybernaut issued a press release revealing further bad news: the Company had received a letter from its independent auditor, Grant Thornton, questioning the accuracy and reliability of the Company's accounting and related disclosures, and that, as a result, investors should not to rely on certain of the Company's historical financial statements. The Company stated as follows:

FAIRFAX, Va.--(BUSINESS WIRE)--April 8, 2005--Xybernaut® Corporation (NASDAQ:XYBRE - News) announced today that investors and others should refrain from relying upon the Company's historical

financial statements, together with the related audit reports the Company received from its outside auditors, Grant Thornton LLP, for the years ended December 31, 2002 and 2003, and interim quarterly reports for the quarters ended March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004, June 30, 2004 and September 30, 2004.

The Company's action was taken in response to a letter which the Company received from Grant Thornton LLP, on April 6, 2005, indicating that the nature of the items disclosed by the Company in its Form 8-K filed on April 1, 2005, and the uncertainties surrounding the results of the ongoing Audit Committee investigation disclosed in such Form 8-K, have caused the firm to question the accuracy and reliability of the Company's accounting and related disclosures provided in the specified prior period financial statements. The Audit Committee has reviewed the Company's disclosure in this press release and in the Company's related Form 8-K with Grant Thornton LLP.

Upon completion of the Audit Committee's investigation, the Company intends promptly to implement any recommendations resulting from the Audit Committee's investigation and to take any other actions necessary to satisfy the concerns raised by Grant Thornton LLP. The Company has retained Kalorama Partners, LLC, a consulting firm founded by former SEC Chairman Harvey Pitt, to assist the Company in fulfilling these commitments.

The Company also announced today that on April 5, 2005, it received notice from The Nasdaq Stock Market of Nasdaq's intent to delist the Company's securities at the opening of business on April 14, 2005, subject to the Company's right to request a hearing with the Nasdaq Listing Qualifications Panel in accordance with the Marketplace Rule 4800 Series. In the notice, Nasdaq asserted that the Company is in violation of Nasdaq Marketplace Rule 4310(c)(14) because, as the Company previously announced, it has not yet filed its Annual Report on Form 10-K with Nasdaq and the SEC. Prior to April 12, 2005, the Company intends to request a hearing before a Nasdaq Listing Qualifications Panel to review the staff's determination which will suspend the delisting of the Company's securities until the hearing determination. There can be no assurance that, following the hearing, the Panel will grant the Company's request for continued listing.

In addition, as provided in the notice, at the opening of business on April 7, 2005, an "E" was appended to the end of the Company's trading symbol for its securities, so that the symbol became "XYBRE."

In reaction to this news, the price of Xybernaut stock, which had already fallen $0.23 per share since the Company's announcement on March 14, 2005 that it would not be able to timely file its annual report, fell another $0.06 to close at $0.13 on the next trading day, April 11, 2005.

66.     On April 19, 2005, the Company announced after the market had close the completion of its internal investigation and the following shocking findings:

> 1. The Company's Chairman and CEO, Edward G. Newman, improperly used substantial Company funds for personal expenses and failed properly to substantiate expenses charged to the Company.
>
> 2. Members of the CEO's family employed by the Company were hired and evaluated/not evaluated in direct violation of the Company's anti-nepotism policy and constituted a "protected class" of employees.
>
> 3. The employment of certain members of the CEO's family was not disclosed in SEC filings as required by SEC disclosure regulations.
>
> 4. There has been a lack of adherence to effective disclosure controls governing the Company's public disclosures and the issuance of press releases.
>
> 5. Major transactions were entered into by certain members of senior management in violation of Company internal controls. Certain members of Senior management failed properly to advise the Board of material financial conditions regarding major transactions.
>
> 6. Certain members of senior management failed to disclose to the Audit Committee and the Board written correspondence by the Company's former Chief Financial Officer outlining serious concerns over the breakdown of internal controls; and
>
> 7. Edward G. Newman and Steven A. Newman affirmatively impeded the Audit Committee's investigation in material respects.
>
> In response to the Audit Committee's Report and Recommendations, the Board today approved the following actions:
>
> 1. Edward G. Newman was removed as Chairman of the Board and Chief Executive Officer of the Company, and from all other positions he holds with any Company subsidiaries or affiliates.
>
> 2. Steven A. Newman was removed as President and Chief Operating Officer of the Company, and Vice Chairman of the Board, and from all other positions he holds with any Company subsidiaries or affiliates.
>
> 3. The Board formally requested the resignations of Edward G. and Steven A. Newman as Directors of the Company, but neither individual has agreed to resign from the Board at this time.
>
> 4. Retired General William Tuttle was appointed as the Company's Interim Chairman of the Board and Chief Executive Officer, while a search is conducted for new management.

27

5. The Board authorized the retention of financial experts to assist the Board in maximizing shareholder value.

6. In an effort to promote the independence of the Company's Board, three directors of the Company -- James J. Ralabate, Dr. Edwin Vogt and Martin Weisberg, each of whom provides other services for the Company -- offered to resign from the Board. The Board determined to defer its acceptance of these offers upon an orderly transition to a new Board.

The Company also announced that Grant Thornton LLP has resigned as the Company's independent auditors. The Company received a letter from Grant Thornton LLP on April 14, 2005, stating that Grant Thornton LLP has concluded that, in its professional judgment, it can no longer rely on management's representations and has resigned as the Company's registered independent accounting firm. On April 8, 2005, the Company advised investors and others that, based upon a letter the Company received from Grant Thornton LLP on April 6, 2005, no reliance should be placed upon certain of the Company's historical financial statements, together with the related audit reports the Company received from its outside auditors. In light of Grant Thornton LLP's resignation, the Company advises investors and others to continue to refrain from relying upon any of the Company's historical financial statements, together with the related audit reports the Company received from its outside auditors, Grant Thornton LLP.

The reports of Grant Thornton LLP on the Company's financial statements for the 2002 and 2003 fiscal years did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles. In addition, in connection with the audits of the Company's financial statements for fiscal years 2002 and 2003, and in the subsequent interim periods, there were no disagreements between the Company and Grant Thornton LLP on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure which, if not resolved to the satisfaction of Grant Thornton LLP, would have caused Grant Thornton LLP to make reference to the matter in connection with its report.

However, as noted above, Grant Thornton LLP has now concluded that, in its professional judgment, it can no longer rely on management's representations. After Grant Thornton LLP was advised of the results of the Audit Committee investigation, Grant Thornton LLP advised the Audit Committee's counsel that certain members of senior management failed to disclose facts material to the financial statements and the weaknesses in the internal controls. The Audit Committee has discussed the basis for Grant Thornton LLP's conclusion with Grant Thornton LLP and has authorized Grant Thornton LLP to respond fully to the inquiries of any successor accountant concerning this subject. The Audit Committee has reviewed the Company's disclosure in this press release and in the Company's related Form 8-K with Grant Thornton LLP.

In light of Grant Thornton LLP's resignation as the Company's
independent auditor and the other matters discussed above, the Company
is unable to predict when new auditors will be selected and its Form 10-K
will be filed.

67.     On April 25, 2005, Xybernaut announced that the United States Attorneys

Office for the Eastern District of Virginia had commenced an investigation of the Company

relating to the wrongdoing discovered in it internal investigation. In addition, Xybernaut stated

that "it continues to face a severe liquidity crisis and possible insolvency" and that it may not

have sufficient cash to meet its financial obligations or fund continuing operations.    To address

these concerns, the Company announced the formation of the Office of the Chairman of the

Board consisting of three co-chairmen. In the release, the Company stated, in relevant part, as

follows:

FAIRFAX, Va.--(BUSINESS WIRE)--April 25, 2005-- Xybernaut®
Corporation (NASDAQ:XYBRE - News) today announced that William
Tuttle and two other outside directors, Harry E. Soyster and Marc
Ginsberg, will serve as co-chairmen in a newly created Office of the
Chairman of the Board. Although the three co-chairmen will act as
directors and not as management, they will provide counsel and be a
resource to senior management.

On April 23, 2005, Tuttle formally resigned as the Company's Interim
Chairman and Chief Executive Officer and joined Soyster and Ginsberg in
forming the newly created Office of Chairman of the Board. Tuttle's
resignation was based upon his concerns about his ability to satisfy
unilaterally the significant time commitments required to effectively
address the needs of shareholders and employees. Tuttle also stated that he
remains committed to continued participation in the effort to determine the
best way forward for the Company, working along with Soyster and
Ginsberg.

The Company also announced that the Company was contacted Friday,
April 22 by the U. S. Attorney's Office for The Eastern District of
Virginia, which is opening an investigation. In addition, the Audit
Committee, through its legal counsel, has contacted the Securities and
Exchange Commission in connection with the previously disclosed Audit
Committee investigation and findings. The Company will cooperate fully
in these investigations and any others.

The Company also affirmed that it continues to face a severe liquidity
crisis and possible insolvency. There can be no assurances that the

Company will have sufficient cash to meet its financial obligations or fund continuing operations. The Office of the Chairman of the Board is authorized to retain a consultant with financial and management restructuring expertise. The Company intends to work with such adviser to reduce costs, conserve cash, and obtain advice regarding restructuring and other alternatives to maximize shareholder value.

## UNDISCLOSED ADVERSE INFORMATION

68.    The market for Xybernaut's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Xybernaut's common stock traded at artificially inflated prices during the Class Period. The artificial inflation continued until at least April 8, 2005. Plaintiff and other members of the Class purchased or otherwise acquired Xybernaut securities relying upon the integrity of the market price of Xybernaut's securities and market information relating to Xybernaut, and have been damaged thereby.

69.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Xybernaut's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

70.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Xybernaut's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Xybernaut and its business, prospects and operations, thus

causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

### ADDITIONAL SCIENTER ALLEGATIONS

71.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Xybernaut, their control over, and/or receipt and/or modification of Xybernaut's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Xybernaut, participated in the fraudulent scheme alleged herein. In addition, defendants were motivated to engage in the fraudulent scheme to complete at least $25.85 million in private placements of Company stock and warrants, and long-term borrowings.

### DEFENDANTS' FINANCIAL STATEMENTS
### DURING THE CLASS PERIOD WERE
### MATERIALLY FALSE AND MISLEADING AND VIOLATED GAAP

72.    At all relevant times during the Class Period, defendants represented that Xybernaut's financial statements when issued were prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. However, in

31

order to artificially inflate the price of Xybernaut's stock, defendants used improper accounting

practices in violation of GAAP and SEC reporting requirements to falsely inflate its assets,

stockholders' equity and earnings during the Class Period.

73.     Xybernaut's materially false and misleading Financial Statements resulted

from a series of deliberate senior management decisions designed to conceal the truth regarding

Xybernaut's actual operating results.  Specifically, as discussed herein, defendants caused the

Company to violate GAAP by (1) improperly accounting for revenue related to certain product

sales; (2) improperly accounting for expense reimbursements; and (3) failing to disclose and

properly account for related party transactions in accordance with GAAP and SEC rules.

74.     GAAP are those principles recognized by the accounting profession as the

conventions, rules, and procedures necessary to define accepted accounting practices at a

particular time.  As set forth in Financial Accounting Standards Board ("FASB") Statements of

Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting

is that it provide accurate and reliable information concerning an entity's financial performance

during the period being presented.  Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's
> financial performance during a period.  Investors and creditors often use
> information about the past to help in assessing the prospects of an
> enterprise.  Thus, although investment and credit decisions reflect
> investors' and creditors' expectations about future enterprise performance,
> those expectations are commonly based at least partly on evaluations of
> past enterprise performance.

75.     As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial

statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be

presumed to be misleading or inaccurate."  17 C.F.R. § 210.4-01(a)(1).  Management is

responsible for preparing financial statements that conform with GAAP.  As noted by the AICPA

professional standards:

financial statements are management's responsibility . . . . [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management . . . . Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

## Xybernaut's Improper Failure To Disclose Material Related Party Transactions

76.     In FASB's Statement of Financial Accounting Standard ("SFAS") No. 57,

*Related Party Disclosures* (March 1982), GAAP provides guidance on disclosures of

transactions between related parties.[1]  SFAS No. 57 states that an "enterprise's financial

statements may not be complete without additional explanations of and information about related

party transactions and thus may not be reliable."  Accordingly, ***SFAS No. 57 requires that***

***financial statements identify material related party transactions and disclose (a) the "nature of***

***the relationship(s)," (b) a "description of the transactions," (c) the "dollar amount of***

***transactions for each period for which an income statement is presented," and (d) the***

***"[A]mounts due from or to the related parties as of the date of each balance sheet."[2]***

(Emphasis added.)

77.     In addition, as noted in the SEC's SAB Topic 4E, GAAP provides that:

> *[I]n some cases, the significance of an amount may be independent of the amount involved.  For example, amounts due to and from officers and directors, because of their special nature and origin, ought generally to be set forth separately [in financial statements] even though the dollar amounts involved are relatively small.*  (Emphasis added.)

---

[1] Pursuant to SFAS No. 57, related party transactions include transactions between an enterprise and its Directors, CEO, COO, Vice Presidents in charge of principal business functions, and other persons who perform similar policy-making functions.

[2] Pursuant to SFAS No. 57, disclosure of compensation arrangements that are not in the ordinary course is necessary for users to understand financial statements.

78.     As Xybernaut has now admitted, before and during the Class Period, it engaged in numerous material related party and self-dealing transactions that were not disclosed in its financial statements in violation of GAAP, including at least the following (during the Class Period):

        a.      Defendant Edward Newman's improper use of substantial Company funds for personal expenses and failure to properly substantiate expenses charged to the Company; and

        b.      Major transactions entered into by certain members of senior management in violation Company internal controls and their failure to properly advise the Board of Directors of material financial conditions regarding the transactions.

79.     Moreover, GAAP, in APB Opinion No. 22, *Disclosure of Accounting Policies* ¶ 7 (April 1972), provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company. In fact, GAAP states that information about the accounting policies adopted by a reporting company is "essential" for financial statement users. *Id.* ¶ 8. Accordingly, GAAP, in paragraph 12 of APB Opinion No. 22 provides:

> In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and methods that involve any of the following:
>
>     a.    A selection from existing acceptable alternatives;
>
>     b.    Principles and methods peculiar to the industry in which the reporting entity operates, even if such principles and methods are predominantly followed in that industry;
>
>     c.    Unusual or innovative applications of generally accepted accounting principles (and, as applicable, of principles and

methods peculiar to the industry in which the reporting entity operates).

80.    Xybernaut's Class Period financial statements were thus also false and misleading and failed to comply with GAAP because they failed to disclose and identify the improper accounting of revenue related to certain product sales. Accordingly, investors were unable to assess the appropriateness of, or the risks associated with, Xybernaut's financial reporting.

81.    Xybernaut's failures violated a number of additional GAAP provisions. For example, GAAP provides that:

a.    financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (CON No. 1, ¶ 34);

b.    financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (CON No. 1, ¶ 40);

c.    financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (CON No. 1, ¶ 50);

d.    financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those

35

expectations are commonly based at least partly on evaluations of past enterprise performance (CON No. 1, ¶ 42);

    e.  financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (CON No. 2, ¶¶ 58-59);

    f.  financial reporting should be complete, so that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (CON No. 2, ¶ 79); and

    g.  financial reporting should be conservative and ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (CON No. 2, ¶¶ 95, 97).

### Failure to Maintain an Adequate System of Internal Controls

  82.  In addition to the foregoing improper accounting practices, the Company also suffered from a chronic and systematic breakdown of its internal accounting controls throughout the Class Period, which rendered Xybernaut's financial reporting inherently corrupt, subject to manipulation and unreliable, resulting in materially false and misleading financial statements.

  83.  In this regard, the Defendants failed to design and implement an internal control system over the Company's financial reporting processes allowing defendants to improperly report revenue related to the sale of certain products, and to engage in improper related party transactions.

  84.  Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: (A) make and keep books, records and accounts which, in reasonable

detail, accurately and fairly reflect the transactions and disposition of the assets of the issuer; and (B) devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP. These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

85.    Xybernaut violated Section 13(b)(2)(A) of the Exchange Act by failing to maintain accurate records concerning its reporting of revenue related to certain product sales, related party transactions entered into by members of the Company's senior management, and reimbursements of expenses.   Accordingly, Xybernaut violated Section 13(b)(2)(A) of the Exchange Act.

86.    In addition, Xybernaut violated Section 13(b)(2)(B) of the Exchange Act by failing to implement procedures reasonably designed to prevent accounting irregularities. Xybernaut failed to put into place proper reviews and checks to ensure that its management did not engage in accounting improprieties. It failed to ensure that transactions were reported in accordance with its own policies and with GAAP. Accordingly, Xybernaut violated Section 13(b)(2)(B) of the Exchange Act.

87.    Xybernaut's lack of adequate internal controls rendered Xybernaut's Class Period financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP. Nonetheless, throughout the Class Period, the Company regularly issued quarterly and annual financial statements without ever disclosing the existence of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

## DEFENDANT GRANT THORNTON LLP
## PARTICIPATION IN THE FRAUD AND ITS SCIENTER

88.     Defendant Grant Thornton is a worldwide firm of certified public accountants, auditors, and consultants.  Grant Thornton's website states that "[t]hrough member firms in 110 countries, including 49 offices in the United States, the partners of Grant Thornton member firms provide personalized attention and the highest quality service to public and private clients around the globe."  Through its Vienna, Virginia office, Grant Thornton served as Xybernaut's auditor and principal accounting firm since fiscal 2000.  Grant Thornton was required to audit the Company's financial statements in accordance with Generally Accepted Auditing Standards ("GAAS")[3], and to report the audit results to Xybernaut, the board of directors, the audit committee, and the members of the investing public, including plaintiffs and other members of the Class.  With knowledge of Xybernaut's true financial condition, or in reckless disregard thereof, Grant Thornton certified the materially false and misleading financial statements of Xybernaut, described below and provided unqualified Independent Auditors' Reports, which were included in the SEC filings and publicly disseminated statements.  Without these materially false and misleading unqualified audit opinions, the fraud alleged above could not have been perpetrated.

## Grant Thornton Had Full and Complete Access to Xybernaut's Information

89.     Grant Thornton, by virtue of its of its relationship with Xybernaut and the nature of the auditing and consulting services rendered to the Company, and the fact that Grant Thornton's personnel were regularly present at Xybernaut and had intimate knowledge of Xybernaut's financial reporting practices based on its access to confidential internal corporate,

---

[3] GAAS, as approved and adopted by the American Institute of Certified Public Accountants ("AICPA")' relate to the conduct of the individual audit engagements.  Statements on Auditing Standards (codified and referred to as AU § __) are recognized by the AICPA as the interpretation of GAAS.