IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JEFFREY M. JASKOL AND STACEY J. JASKOL, Individually and On Behalf Of All Others Similarly Situated,<br><br>                Plaintiffs,<br><br>vs.<br><br>XYBERNAUT CORPORATION, EDWARD G. NEWMAN, STEVEN A. NEWMAN, THOMAS D. DAVIS, BRUCE C. HAYDEN, and GRANT THORNTON LLP,<br><br>                Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>**JURY TRIAL DEMANDED** |

# PART 3 of 3

financial, operating and business information, Grant Thornton knew of or recklessly disregarded the adverse facts alleged herein concerning the Company's improper financial reporting during the Class Period, including the Company's fiscal 2002 and 2003 year-end financial statements and Grant Thornton's unqualified audit opinions thereon. Nonetheless, Grant Thornton knowingly, or recklessly, issued false unqualified audit opinions during the Class Period.

### Grant Thornton Failed to Render an Accurate Audit Report

90. Grant Thornton violated GAAS Standard of Reporting No. 1 that requires the audit report to state whether the financial statements are presented in accordance with GAAP. AU § 508.04. Grant Thornton's opinion falsely represented that Xybernaut's fiscal 2002 and 2003 financial statements were presented in conformity with GAAP when they were not for the myriad reasons herein alleged.

91. The auditor's report must express an opinion on the financial statements taken as a whole and must contain a clear indication of the character of the auditor's work. The auditor can determine that he is able to express an unqualified opinion only if he has conducted his audit in accordance with GAAS. AU § 508.07.

92. Grant Thornton did not render an accurate audit report and thus did not exercise due professional care, because Xybernaut's financial statements were not in conformity with GAAP, and because Grant Thornton failed to perform sufficient procedures to audit Xybernaut's financial statements as of December 31, 2002 and 2003, in accordance with GAAS.

93. Grant Thornton issued its audit opinion, dated February 13, 2003, except for Notes 3 and 14, as to which the date is March 26, 2003, on Xybernaut's fiscal 2002 financial statements. Grant Thornton's opinion stated that such Xybernaut financial statements were

presented in conformity with GAAP and that Grant Thornton's audit was performed in accordance with GAAS:

> We have audited the accompanying consolidated balance sheets of Xybernaut Corporation (a Delaware corporation) as of December 31, 2002 and 2001, and the related consolidated statements of operations, stockholders' equity, and cash flows for the three years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.
>
> We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Xybernaut Corporation as of December 31, 2002 and 2001, and the results of its operations and its cash flows for the three years then ended in conformity with accounting principles generally accepted in the United States of America.

94.    Grant Thornton issued its audit opinion, dated February 19, 2004, on Xybernaut's fiscal 2003 financial statements, which it stated were presented in conformity with GAAP and that Grant Thornton's audit was performed in accordance with GAAS:

> We have audited the accompanying consolidated balance sheets of Xybernaut Corporation (a Delaware corporation) as of December 31, 2003 and 2002, and the related consolidated statements of operations, stockholders' equity, and cash flows for the three years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.
>
> We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the

amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Xybernaut Corporation as of December 31, 2003 and 2002, and the results of its operations and its cash flows for the three years then ended in conformity with accounting principles generally accepted in the United States of America.

95. In issuing such audit opinions, Grant Thornton turned a blind eye to Xybernaut's improper accounting practices, as described above, and issued unqualified audit opinions on Xybernaut's fiscal 2002 and 2003 financial statements, even though Grant Thornton knew or recklessly disregarded that: (a) the financial statements had not been prepared in conformity with GAAP in numerous respects and did not present fairly, in all material respects, the financial position of Xybernaut and its subsidiaries as of December 31, 2002 and 2003, and the results of their operations and cash flow for the years ended December 31, 2002 and 2003; and (b) Grant Thornton had not audited Xybernaut's fiscal 2002 and 2003 financial statements in accordance with GAAS. As set forth in detail herein, Xybernaut's violations of GAAP during the Class Period include, among other things:

- the improper reporting of revenue relating to certain product sales;
- improper accounting of related party transactions entered into by members of the Company's senior management; and
- improper accounting of reimbursement of Company expenses.

**Grant Thornton Failed to Obtain Sufficient Competent Evidential Matter**

96. During the course of Grant Thornton's audits of Xybernaut, there appeared "red flags" which should have raised questions in the auditors' minds and led them to procure additional evidential matter. In conducting an audit, an auditor must obtain sufficient

41

competent evidential matter through inspection, observation, inquiries and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. AU § 326.01.

97. For example, during the Class Period, Grant Thornton knew or recklessly disregarded the following "red flags":

> 1. The Xybernaut Defendants' willingness and desire of the Company's Chairman and CEO, Edward G. Newman, improperly used substantial Company funds for personal expenses and failed properly to substantiate expenses charged to the Company.
>
> 2. Members of the CEO's family employed by the Company were hired and evaluated/not evaluated in direct violation of the Company's anti-nepotism policy and constituted a "protected class" of employees.
>
> 3. The employment of certain members of the CEO's family was not disclosed in SEC filings as required by SEC disclosure regulations.
>
> 4. There has been a lack of adherence to effective disclosure controls governing the Company's public disclosures and the issuance of press releases.
>
> 5. Major transactions were entered into by certain members of senior management in violation of Company internal controls. Certain members of Senior management failed properly to advise the Board of material financial conditions regarding major transactions.

98. The foregoing "red flags" provided notice to Grant Thornton about Xybernaut management's character and lack of integrity. Management's lack of integrity should, in turn, have caused Grant Thornton to re-evaluate its risk assessments. GAAS requires that risk assessments, and accordingly, any reevaluations of risk assessments, should be made with consideration of applicable risk factors. *See* AU §§ 316.12, 316.14. The auditor's response to a risk assessment should be "influenced by the nature and significance of the risk factors identified as being present." AU § 316.25. One of the principal categories of "risk factors that relate to misstatements arising from fraudulent financial reporting" is an "[i]nadequate monitoring of significant controls." AU § 316.17.

99. Grant Thornton also failed to comply with Statement on Auditing Standards No. 8, in that Grant Thornton failed to take appropriate action relating to material misstatements of fact contained in the MD&A section of Xybernaut's Forms 10-K during the Class Period relating to the disclosures regarding earnings, as evidenced by the "lack of adherence to effective disclosure controls governing the Company's public disclosures . . . ." *See* AU § 550.

### Grant Thornton Failed to Exercise Due Professional Care

100. Auditors must exercise due professional care in performing the audit and preparing the audit report. AU § 230.01. Due professional care concerns what the auditor does and how well he does it. AU § 230.04.

101. Grant Thornton did not exercise due professional care because it failed to: obtain sufficient competent evidential matter to support the assertions in the financial statements; maintain an attitude of professional skepticism; and render an accurate audit report on behalf of Xybernaut.

102. Grant Thornton violated GAAS Standard of Reporting No. 3 that requires that, informative disclosures in the financial statements are to be regarded as reasonably adequate unless otherwise stated in the report. Grant Thornton knew or recklessly that Xybernaut's disclosures were not reasonably adequate.

103. For example, Grant Thornton ignored the fact that Xybernaut failed to make adequate disclosures concerning accounting policies relating to the recognition of revenue on the sales of certain products. GAAP provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company. APB Opinion No. 22 ¶ 7. In fact, GAAP states that

information about the accounting policies adopted by a reporting company is "essential" for financial statement users. *Id.* ¶ 8. Accordingly, GAAP, in APB Opinion No. 22 ¶ 12, provides:

> In general, the disclosure should encompass important judgments as to appropriateness of principles relating to recognition of revenue and allocation of asset costs to current and future periods; in particular, it should encompass those accounting principles and methods that involve any of the following:
>
> a. A selection from existing acceptable alternatives
>
> b. Principles and methods peculiar to the industry in which the reporting entity operates, even if such principles and methods are predominantly followed in that industry;
>
> c. Unusual or innovative applications of generally accepted accounting principles (and, as applicable, of principles and methods peculiar to the industry in which the reporting entity operates).

104. Accordingly, because Xybernaut "omit[ted] from the financial statements, including the accompanying notes, information that [was] required by generally accepted accounting principles, [Grant Thornton] should [have] express[ed] a qualified or an adverse opinion and should [have] provide[d] the information in [their] report." AU § 431.03.

105. Grant Thornton violated GAAS Standard of Reporting No. 4 that requires that, when an opinion on the financial statements as a whole cannot be expressed, the reasons therefore must be stated. Grant Thornton should have stated that no opinion could be issued by it on Xybernaut's fiscal 2002 or 2003 financial statements or issued an adverse opinion stating that the fiscal 2002 and 2003 financial statements were not fairly presented.

106. Grant Thornton violated GAAS General Standard No.2 that requires that independence in mental attitude is to be maintained by the auditor in all matters related to the assignment.

107. Grant Thornton violated SAS No. 82 in that it failed to adequately consider the risk that the audit financial statements of Xybernaut were free from material misstatement, whether caused by errors or fraud. Grant Thornton knew or recklessly ignored

44

numerous risks relevant to financial reporting including events and circumstances that occurred or existed at Xybernaut during the Class period, which adversely affected Xybernaut's ability to initiate, record, process, and report financial data consistent with the assertions of management in the financial statements. These events or circumstances include, but are not limited to:

- *Changes in operating environment.* Changes in the regulatory or operating environment can result in changes in competitive pressures and significantly different risks.

- *New or revamped information systems.* Significant and rapid changes in information systems can change the risk relating to internal control.

- *Rapid growth.* Significant and rapid expansion of operations can strain controls and increase the risk of a breakdown in controls.

- *New technology.* Incorporating new technologies into production processes or information systems may change the risk associates with internal control.

- *New business models, products, or activities.* Entering into business areas or transactions with which an entity has little experience may introduce new risks associated with internal control.

- *Corporate restructurings.* Restructurings may be accompanied by staff reductions and changes in supervision and segregation of duties that may change the risk associated with internal control.

- *New accounting pronouncements.* Adoption of new accounting principles or changing accounting principles may affect risks in preparing financial statements.

108. Grant Thornton violated GAAS and the standards set forth in SAS No. 1 and SAS No. 53 by, among other things, failing to adequately plan its audit and properly supervise the work of assistants and to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities that would have a material effect upon the financial statements.

109. Grant Thornton violated GAAS and the standards set forth in SAS No. 8, by failing to take appropriate action relating to material misstatements of fact contained in the

MD&A section of Xybernaut's fiscal 2002 and 2003 Forms 10-K relating to the disclosures regarding the recognition of revenue recognition related to certain product sales.

110.   Grant Thornton violated GAAS Standard of Field Work No. 2, which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to determine whether reliance thereon was justified, and if such controls are not reliable, to expand the nature and scope of the auditing procedures to be applied. The standard provides that a sufficient understanding of an entity's internal control structure be obtained to adequately plan the audit and to determine the nature, timing and extent of tests to be performed. AU § 150.02. In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure: the control environment, the accounting system, and control procedures. AU § 319.02.

111.   As a result of its failure to accurately report on Xybernaut's fiscal 2002 and 2003 financial statements, Grant Thornton utterly failed in its role as an auditor as defined by the SEC. SEC Accounting Series Release No. 296, Relationships Between Registrants and Independent Accountants, Securities Act Release No. 6341, Exchange Act Release No. 18044, states in part:

> Moreover, the capital formation process depends in large part on the confidence of investors in financial reporting. An investor's willingness to commit his capital to an impersonal market is dependent on the availability of accurate, material and timely information regarding the corporations in which he has invested or proposes to invest. The quality of information disseminated in the securities markets and the continuing conviction of individual investors that such information is reliable are thus key to the formation and effective allocation of capital. Accordingly, the audit function must be meaningfully performed and the accountants' independence not compromised. The auditor must be free to decide questions against his client's interests if his independent professional judgment compels that result.

112.   Grant Thornton's opinions, which represented that Xybernaut's fiscal 2002 and 2003 year end financial statements were presented in conformity with GAAP, were

materially false and misleading because Grant Thornton knew or was reckless in not knowing that Xybernaut's fiscal 2002 and 2003 year end financial statements violated the principles of fair reporting and GAAP. In the course of rendering its unqualified audit certification on Xybernaut's fiscal 2002 and 2003 year end financial statements, Grant Thornton knew it was required to adhere to each of the herein described standards and principles of GAAS, including the requirement that the financial statements comply in all material respects with GAAP. Grant Thornton, in issuing its unqualified opinions, knew or recklessly disregarded that by doing so it was engaging in gross departures from GAAS, thus making its opinions false, and issued such certifications knowing or recklessly disregarding that GAAS had been violated.

113.   Grant Thornton knew or recklessly disregarded facts that indicated that it should have: (a) disclaimed or issued adverse opinions on Xybernaut's fiscal 2002 and 2003 year end financial statements; or (b) withdrawn, corrected or modified its opinion for the years ended December 31, 2002 and 2003 to recognize Xybernaut's improper accounting and financial reporting stated above.

114.   Accordingly, Grant Thornton ignored the guidance under Section 10A of the Securities and Exchange Act which requires the auditor to design procedures "to identify related party transactions that are material to the financial statements or otherwise require disclosure therein . . . ." In addition, Grant Thornton failed to evaluate all the information available concerning the related party transactions, to determine whether they were adequately disclosed, in accordance with SFAS 57, in the financial statements. *See* AU § 334.11.

115.   Grant Thornton ignored that "evidence of significant or extensive undisclosed related party transactions" is indicative of a significant deficiency in the design or operation of internal control that could adversely affect Xybernaut's "ability to record process,

summarize, and report financial data consistent with the assertions of management in the financial statements." AU § 325.21.

116. Grant Thornton failed to consider whether additional audit testing was required for related party transactions, it also regularly failed to undertake some of the basic audit procedures in connection with related party transactions. AU § 334.08. Moreover, once an auditor has identified related party transactions, the auditor should apply the procedures he considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements. AU § 334.09. The procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management. AU § 334.09.

117. According to SAB No. 99, "quantitative benchmarks for assessing materiality (*e.g.*, a five percent threshold) do not apply in circumstances involving self-dealing and misappropriation of corporate assets by senior management."

## FIRST CLAIM

### VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

118. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

119. During the Class Period, Xybernaut and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Xybernaut's securities; and (iii) cause plaintiffs and other members of the Class to purchase

48

Xybernaut's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

120. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Xybernaut's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

121. In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 et seq.) and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

122. Xybernaut and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Xybernaut as specified herein.

123. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Xybernaut's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Xybernaut and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Xybernaut's securities during the Class Period.

124. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

125. The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that

they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Xybernaut's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

126. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Xybernaut's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Xybernaut's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired Xybernaut securities during the Class Period at artificially high prices and were damaged thereby.

127. At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiffs and the other members of the Class and the marketplace known of the true financial condition and business prospects of Xybernaut, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Xybernaut

51

securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

128.   By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

129.   As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUALS DEFENDANTS

130.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

131.   The Individual Defendants acted as controlling persons of Xybernaut within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

132. In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

133. As set forth above, Xybernaut and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiffs pray for relief and judgment, as follows:

1. Determining that this action is a proper class action and appointing plaintiffs as Lead Plaintiff and their counsel as Lead Counsel for the Class and certifying them as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

2. Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3. Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4. Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  May 4, 2005

Respectfully submitted,

**MILBERG WEISS BERSHAD  
& SCHULMAN LLP**

By: /s/ Seth D. Rigrodsky
Seth D. Rigrodsky (#3147)
Ralph N. Sianni (#4151)
Brian D. Long (#4347)
919 N. Market Street, Suite 411
Wilmington, DE 19801
(302) 984-0597 (Tel)
(302) 984-0870 (Fax)

--and--

**MILBERG WEISS BERSHAD  
& SCHULMAN LLP**
Steven G. Schulman
David P. Brower
Peter E. Seidman
Sharon M. Lee
One Pennsylvania Plaza – 49th Floor
New York, NY  10119-0165
Telephone:  (212) 594-5300
Facsimile:  (212) 868-1229

**Plaintiff's Counsel**

## CERTIFICATION OF PLAINTIFFS
## PURSUANT TO FEDERAL SECURITIES LAWS

We, Jeffrey M. Jaskol and Stacey J. Jaskol, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. We have reviewed the Xybernaut Corp. complaint prepared by Milberg Weiss Bershad & Schulman LLP, whom we designate as our counsel in this action for all purposes.

2. We did not acquire Xybernaut Corp. securities at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

4. We are willing to serve as a named or lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

5. We will not accept any payment for serving as a representative party beyond its pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the court pursuant to law.

6. We have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

7. We understand that this is not a claim form, and that our ability to share in any recovery as a member of the class is unaffected by our decision to serve as a representative party.

8. Since May 10 2002, we have made the following transactions in Xybernaut Corp. and will provide records of those transactions upon request:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| | SEE ATTACHED | | |

We declare under penalty of perjury that the foregoing is true and correct.

Executed this 29 day of April, 2005.                Executed this 29 day of April, 2005.

By: _____                        By: _____
    Jeffrey M. Jaskol                                   Stacey J. Jaskol

## Schedule A
### Xybernaut Corporation (Nasdaq: XYBRE)
### Jeffrey M. Jaskol & Stacey J. Jaskol

**AIC JMJ Rev Trust**

Purchase(s):

| DATE | SHARES | COST |
|---|---|---|
| 9/16/2003 | 1,000 | 1.19 |
| 1/23/2004 | 1,000 | 1.95 |
| 3/11/2004 | 1,500 | 1.44 |
| 3/8/2005 | 400 | 0.81 |
| 3/28/2005 | 1,100 | 0.58 |
| 4/7/2005 | 1,000 | 0.22 |

Sale(s):

| DATE | SHARES | COST |
|---|---|---|
| 11/28/2003 | 1,000 | 1.55 |

**AIC Money Purchase**

Purchase(s):

| DATE | SHARES | COST |
|---|---|---|
| 11/6/2003 | 1,000 | 1.92 |
| 2/19/2004 | 245 | 1.75 |
| 2/19/2004 | 755 | 1.75 |
| 1/31/2005 | 2,000 | 1.05 |
| 4/7/2005 | 4,000 | 0.22 |

Sale(s):

**AIC S & J Joint**

Purchase(s):

| DATE | SHARES | COST |
|---|---|---|
| 8/1/2002 | 1,000 | 0.48 |
| 8/1/2002 | 2,000 | 0.48 |
| 10/21/2002 | 2,000 | 0.22 |
| 11/14/2002 | 1,000 | 0.52 |
| 3/20/2003 | 3,000 | 0.42 |
| 2/19/2004 | 1,500 | 1.75 |
| 4/7/2005 | 3,000 | 0.22 |

Sale(s):

**AIC Profit Sharing**

Purchase(s):

| DATE | SHARES | COST |
|---|---|---|
| 5/29/2002 | 1,500 | 0.83 |
| 8/1/2002 | 1,000 | 0.48 |
| 8/1/2002 | 2,000 | 0.48 |
| 10/21/2002 | 3,000 | 0.22 |
| 3/20/2003 | 3,500 | 0.42 |

|  | | | |
|---|---|---|---|
| | 5/16/2003 | 3,000 | 0.48 |
| | 5/20/2003 | 5000 | 0.39 |
| | 10/7/2003 | 15,000 | 1.847 |
| | 11/19/2003 | 3,185 | 1.85 |
| | 11/19/2003 | 1,815 | 1.85 |
| | 11/24/2003 | 5,000 | 1.85 |
| | 11/28/2003 | 5,000 | 1.55 |
| | 3/8/2005 | 2,000 | 0.81 |
| **Sale(s):** | | | |
| | 10/03/03 | 25,000 | 1.6110 |

**AIC SJJ SEP IRA**

| | DATE | SHARES | COST |
|---|---|---|---|
| **Purchase(s):** | | | |
| | 5/15/2003 | 2,000 | 0.48 |
| | 10/6/2003 | 5,000 | 1.683 |
| **Sale(s):** | | | |